**THE TRUSTEES OF INDIANA UNIVERSITY, Appellant–Defendant,**

**v.**

**H. Daniel COHEN, Appellee–Plaintiff.**

No. 20A03–0812–CV–590.

Court of Appeals of Indiana.

July 30, 2009.

Paul H. Sinclair, Paul C. Sweeney, Brian J. Paul, Ice Miller, LLP, Indianapolis, IN, Attorneys for Appellant.

Jay Meisenhelder, Ryan P. Sink, Haskin, Lauter, & LaRue, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

In this interlocutory appeal, the Trustees of Indiana University (the "University") appeal the trial court's denial of its motion for summary judgment regarding a complaint filed by H. Daniel Cohen. The University raises several issues, which we revise and restate as whether the trial court erred when it denied the University's motion for summary judgment. We reverse.

The relevant facts designated by the parties follow. The University hired Cohen in 1987 to serve as a professor of physics with tenure and as Chancellor of the University's campus in South Bend, Indiana ("IUSB"). A female employee of the University accused Cohen of forcibly kissing and groping her breasts during a private meeting in Cohen's office in November of 1994. As a result of the sexual harassment allegations against him, Cohen agreed to resign his position as Chancellor of IUSB and the University agreed that Cohen would continue to be a professor of physics.

The University and Cohen entered into a letter agreement (the "Agreement") dated May 2, 1995. The Agreement provided that Cohen would resign as Chancellor of IUSB, effective as of May 10, 1995, and that Cohen would receive a one-year sabbatical from July of 1995 until June of 1996. Paragraph 3 of the Agreement stated:

3. If Dr. Cohen returns to the University following his sabbatical, he will be a Professor of Physics, with tenure with the rights and responsibilities attendant to that position. His salary will be ten-twelfths (10/12) of his current salary until he reaches age sixty five. As any other faculty member, Dr. Cohen will be eligible to receive yearly salary increments. In the event Dr. Cohen accepts employment elsewhere prior to age sixty-five, the University's obligations under this paragraph shall cease.

Appellant's Appendix at 456. Paragraph 10 of the Agreement provided:

10. Any future proven act of sexual harassment or retaliation by Dr. Cohen that occurs from the date of this agreement forth in the course of Dr. Cohen's employment will be considered serious personal misconduct and will result in immediate steps to dismiss Dr. Cohen from the faculty. A memorandum to that effect shall be kept in Dr. Cohen's file and in the files of Indiana University Counsel.

*Id.* at 459.[1]

In December 1999, J.G., a female student who was enrolled in one of Cohen's classes, filed a complaint with the Univer-

---

1. The Agreement also contained terms regarding Cohen's salary and benefits during and after his sabbatical, Cohen's use for two years of a vehicle provided to him by the University, Cohen's obligation to provide collision and automobile insurance in conjunction with the use of the University's vehicle, the University's obligation to maintain term life insurance for Cohen, the University's obligation to provide Cohen with a neutral reference, Cohen's obligations to keep confidential the existence and terms of the Agreement, the University's and Cohen's obligations not to disparage each other, Cohen's obligation to cooperate in any defense of claims or lawsuits in connection with the actions of Cohen, and Cohen's release of any claims he may have had arising out of his employment by the University.

sity's Affirmative Action Office at IUSB (the "AAO") alleging that Cohen had discriminated against her based on gender, religion, sexual harassment, and retaliation. The AAO investigated J.G.'s allegations by interviewing several faculty members and twelve students who had been in Cohen's class with J.G. In November 2000, the AAO sent its written report to IUSB Chancellor Ken Perrin. The AAO report stated:

> While neither religious nor sexual harassment occurred in the classroom, students did complain, and the evidence supports the fact that Cohen was authoritarian, condescending, and demeaning in his responses to some students. Cohen admits that he swore in class, made religious references to himself and others that were not relevant to the subject of the class, and would come back at students who challenged his authority. Such comments raise potential questions of professional conduct under the ... Code of Academic Ethics as adopted by Indiana University especially as it relates to fostering "an atmosphere of mutual trust and respect" in the classroom.
>
>     \*     \*     \*     \*     \*     \*
>
> It is recommended that the Chancellor meet with the Dean of Liberal Arts and Sciences and the Chair of the Physics

Department to take whatever steps are necessary to remedy and monitor Cohen's relations with students to ensure proper respect for all students.

*Id.* at 972.

In June 2000, ten students from one of Cohen's summer session classes wrote a letter to Chancellor Perrin. In the letter, the students complained that Cohen "behaved inappropriately for his position," that Cohen "was constantly cursing and did so directly to students in a small group during an oral exam," that he "consistently ridiculed his students for their lack of knowledge about the subjects he was supposed to be teaching," and that "his demeanor discourages questions and intimidates his students." *Id.* at 979–981.

On January 3, 2001, Chancellor Perrin wrote a letter to Cohen addressing Cohen's conduct. Perrin noted in his letter that the AAO raised questions of potential violations of the University's Code of Academic Ethics and that he had interviewed six of the ten students who sent a letter to him regarding Cohen's conduct. Perrin's letter stated: "It is evident, in spite of your statements to the contrary, that your behavior in the classroom is offensive to many students.... The behavior displayed in your [physical science] classes is in conflict with these core principles of academic ethics, and unacceptable on a student-centered campus." *Id.* at 958.[2]

**2.** On January 13, 2001, Cohen sent a letter to Chancellor Perrin, which stated in part:

I am appalled that you imply that I am a liar. I am astonished that you would side with students against an IUSB faculty member in deciding questions of credibility, all else being equal. You seem willing to chastise faculty members for allegations of rudeness, but not the students.... Your notion of a student centered campus sounds to me like the manager of a supermarket stating that the store needs to be customer oriented: the customer is always right. In case you had not noticed, a university cam-

pus is not at all like a store, nor should it be.... The academic values that you reveal in your letter are antithetical to those required in the leader of a university campus. Therefore, I call on you to resign your post as chancellor immediately.

Appellant's Appendix at 962. In an opinion letter published in the South Bend Tribune on February 8, 2001, Cohen wrote: "Perrin has abundantly demonstrated his incompetence.... Many, including recently retired senior administrators and senior faculty members, believe that he has been systematically destroying the campus.... [I]t is cru-

On March 8, 2001, the South Bend Tribune published a letter to the editor written by Cohen in response to an article critical of Cohen written by Nancy Sulok, a columnist for the Tribune. The last paragraph of Cohen's published letter to the editor read:

> By the way, have you ever noticed that almost all the women who claim to have been sexually harassed are physically ugly? I guess they just need to deny their lack of attractiveness to the opposite sex, and to use this method to get the attention and money they cannot otherwise command.

*Id.* at 960.

That same day, Cohen was walking to his office when he walked by a room where J.G. was taking a make-up examination in connection with a math class, which was not taught by Cohen. In his deposition, Cohen testified that he made eye contact with J.G., and when asked how long he maintained eye contact with her, Cohen replied: "Order of five seconds." *Id.* at 859. J.G. was "visibly very distraught" and "clearly and visibly shaken" by the encounter with Cohen. *Id.* at 975. J.G. filed a complaint with the AAO describing Cohen's actions and alleging retaliation. On March 23, 2001, Cohen filed a complaint of his own with the AAO in which he stated that he did not stand in the doorway and did not "make any comment to [J.G.] or to anyone else at that time." *Id.* at 976. Cohen's complaint then argued that J.G.'s allegations constituted retaliation for the grade she had received in Cohen's course and that J.G. filed her complaint against Cohen in response to seeing his article in the Tribune. In March 2001, Chancellor Perrin sent a letter to Cohen suspending him with pay until the completion of the

cial that IUSB pick as its next leader someone who does understand the right values." *Id.* at

AAO's investigation. Chancellor Perrin stated in his letter: "As you know, retaliation against a person for making a good faith complaint violates the law and university policy." *Id.* at 989.

The AAO undertook a second investigation of Cohen in response to J.G.'s second complaint. On April 17, 2001, the AAO made a determination that J.G.'s account of the incident between J.G. and Cohen on March 8, 2001, was credible. The AAO's investigation included reviewing J.G.'s and Cohen's complaints and interviewing twelve witnesses, including students and professors. The AAO's report noted that the time and location of J.G.'s make-up exam were determined by her math instructor and the math department's secretary (and the exam had been planned before the Tribune article was published). Furthermore, the math instructor indicated that J.G. "was a good student doing B work in the math class all semester long." *Id.* at 938. J.G. "had done A work on the exam in question, until the last page, where there were many mistakes. J.G. had completed all but the last page of the exam before Cohen interrupted her." *Id.* Noting Cohen's submissions to the South Bend Tribune, the AAO's report found: "Cohens's [sic] behavior follows a pattern of harassment and denial. . . . This denial goes beyond defending himself. It is personal, confrontational, and antagonistic toward women who complain about sexual harassment." *Id.* at 939. The AAO also noted that Cohen "forwarded a copy of [J.G.'s] complaint to the press in violation of FERPA [Family Educational Rights and Privacy Act] law and IU policy. This breach of confidentiality went beyond defending himself." *Id.* at 940–941. The AAO's report concluded:

961.

We find that Professor Cohen has violated the Indiana University policy on sexual harassment by creating a hostile intimidating learning environment for women. We also find that he violated the sexual harassment policy by retaliating against [J.G.].... He retaliated against [J.G.] even though the evidence in the original complaint was insufficient to sanction him .... and we find that Cohen targets women in his derisive and menacing behavior....

*Id.* at 941. On April 24, 2001, Cohen submitted a memo to Chancellor Perrin in response to the AAO report arguing that the report lacked credibility and was full of bias.

At the request of Chancellor Perrin, the Academic Senate Promotion, Tenure, and Reappointment Committee met and reviewed the AAO's report from April 17, 2001, and Cohen's written response to the AAO's report, and the Committee recommended "that proceedings of dismissal of Dr. Cohen be initiated." *Id.* at 948. On May 3, 2001, Chancellor Perrin sent a letter to Cohen notifying Cohen that he was being dismissed from the faculty of the University, effective May 13, 2001, on the grounds that Cohen "engaged in serious personal misconduct" and because he "violated the University's Code of Academic Ethics." *Id.* at 1072–1073. Chancellor Perrin's letter also stated that the Faculty Board of Review would hold a hearing regarding Cohen's dismissal as required by the IUSB Faculty Constitution.

In June of 2001, the Faculty Board of Review conducted a hearing "with regard to the dismissal and revocation of tenure of Prof. Cohen." *Id.* at 1076. The hearing lasted approximately twenty hours, during which the Faculty Board of Review reviewed documents submitted by Cohen and the University and heard testimony from nine witnesses, including Cohen,

Chancellor Perrin, an AAO officer, J.G., a police officer, and several former students. The Board determined that Cohen intimidated students, referred to students as stupid, repeatedly and inappropriately yelled at students, made offensive remarks regarding a student's race, and made negative comments about students' religious beliefs. The Board also found that Cohen passed by the room in which J.G. was taking a make-up math exam and that Cohen behaved in a manner that J.G. reasonably found to be hostile and intimidating. The Board concluded that Cohen repeatedly demonstrated disrespect toward students, created a hostile and intimidating learning environment for students, "repeatedly and knowingly violated the Indiana University Code of Academic Ethics," and that Cohen's behavior constituted serious personal misconduct. Appellant's Appendix at 1081. The Faculty Board of Review unanimously recommended that Cohen be dismissed from the tenured faculty at the University "due to serious personal misconduct arising from his violation of the Code of Academic Ethics." *Id.* at 1076. Specifically, the Board's written recommendation provided:

Prof. Cohen has been given many opportunities to succeed at this university. He foreclosed his earlier opportunity as an administrator through his own actions. He has since had further opportunities to succeed as a professor. As faculty members, we firmly believe that, despite numerous and sincere efforts by many parties, Prof. Cohen has refused to conform to the simple but foundational duties required of all members of this faculty. We also firmly believe that his failure to meet these duties would continue if he were to remain on the University's faculty. Prof. Cohen stated as much at the hearing when he said words to the effect that "I am in my 60's, and it is unlikely that I will change." Accord-

ingly, we believe that sanction short of dismissal will be ineffective in preserving the learning and teaching environment of IUSB's academic community. *Id.* at 1081–1082. The Faculty Board of Review's recommendation that Cohen be dismissed was based on its determination that Cohen violated the Indiana University Code of Academic Ethics. On August 2, 2001, the President of the University sent a letter to Cohen concurring with the recommendations of Chancellor Perrin and the Faculty Board that Cohen be dismissed from the University faculty.

■ In April, 2003, Cohen filed a complaint against the University alleging that the University breached its Agreement "by terminating his employment without reason." Appellant's Appendix at 169. On March 19, 2008, the University filed a motion for summary judgment. On May 23, 2008, the trial court denied the University's summary judgment motion, finding that the language in Paragraph 3 of the Agreement that Cohen must perform his duties according to the "responsibilities attendant to [his] position" was ambiguous and that an issue of material fact existed as to whether Cohen breached Paragraph 10 of the Agreement. *Id.* at 2323 n. 2. Both parties filed several motions and briefs with the trial court, including a motion in limine and an amended motion in limine filed by Cohen, a motion to reconsider by the University, a response brief by Cohen, a reply brief by the University, a surreply brief by Cohen, a brief in response to new arguments by the University, and a sur-surreply by Cohen. The trial court denied the University's motion to reconsider. The trial court certified for interlocutory appeal its ruling denying the University's motion for summary judgment on November 10, 2008.

The sole issue is whether the trial court erred by denying the University's motion for summary judgment. Our standard of review for a trial court's denial of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(c); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold*, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. *Id.* at 974.

The University argues that the trial court erred by denying its motion for summary judgment. The University argues that Cohen was subject to the standards set forth in the University's faculty handbooks (including the University's Code of Academic Ethics) and thus the University was permitted to dismiss/terminate Cohen for violations of the Code of Ethics.[3] On the other hand, Cohen argues that Paragraph 3 of the Agreement is ambiguous as to "whether 'the rights and responsibilities attendant to the position [of a tenured Professor of Physics]'[4] to which the 1995 Agreement refers are those in the Consti-

---

3. Specifically, the University argues that because it had independent grounds to dismiss Cohen due to his violation of the University's Code of Ethics, Cohen "has no claim for damages, an essential element of his breach of contract action." Appellant's Reply Brief

at 3. Because we conclude that the University did not breach its Agreement with Cohen, we need not address whether Cohen could have shown damages.

4. Bracketed text appears in original.

tutions and Handbooks." Appellee's Brief at 13.

In its order denying summary judgment, the trial court discussed Paragraph 3 of the Agreement and stated:

The Court specifically finds paragraph three of the [Agreement] to be ambiguous as to whether or not the Constitutions and Handbook override the specific language in paragraph ten, which clearly limits University's right to dismiss Cohen only for "sexual harassment and retaliation[.][5]" Clearly, paragraph three provides Cohen must perform his duties according to the "responsibilities attendant to [his] position.["] ... The Court finds the [Agreement] is ambiguous on this point.

*Id.* at 2323 n. 2.

■ Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate. *City of Lawrenceburg v. Milestone Contractors, L.P.,* 809 N.E.2d 879, 883 (Ind.Ct.App.2004), *trans. denied.* Interpretation of a contract presents a question of law and is reviewed de novo. *Bailey v. Mann,* 895 N.E.2d 1215, 1217 (Ind.2008). A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. *Beam v. Wausau Ins. Co.,* 765 N.E.2d 524, 528 (Ind.2002); *Fackler v. Powell* 891 N.E.2d 1091, 1096 (Ind.Ct.App.2008), *trans. denied; Fetz v. Phillips,* 591 N.E.2d 644, 647 (Ind.Ct.App.1992). When reasonable persons would find a contract susceptible of more than one construction, an ambiguity exists and should be resolved by the trier of fact. *City of Lawrenceburg,* 809 N.E.2d at 883; *Fetz,* 591 N.E.2d at 647. When the language of a written contract is not ambiguous, however, its meaning is a question of law for which summary

judgment is particularly appropriate. *Fetz,* 591 N.E.2d at 647 (quotation marks and citation omitted).

■ A contract is not ambiguous merely because the parties disagree as to its proper construction. *Ethyl Corp. v. Forcum–Lannom Assocs., Inc.,* 433 N.E.2d 1214, 1217 (Ind.Ct.App.1982). When this court interprets an unambiguous contract, we must give effect to the intentions of the parties as expressed in the four corners of the instrument. *Id.; Collins v. McKinney,* 871 N.E.2d 363, 372 (Ind.Ct.App.2007). Clear, plain, and unambiguous terms are conclusive of that intent. *Fetz,* 591 N.E.2d at 647. This court will not construe clear and unambiguous provisions, nor will we add provisions not agreed upon by the parties. *Fetz,* 591 N.E.2d at 647; *Wilson v. Elliott,* 589 N.E.2d 259 (Ind.Ct.App.1992). In interpreting an agreement, the court is under an obligation to read the agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent. *Kelly v. Smith,* 611 N.E.2d 118, 121 (Ind.1993). *See also Evansville–Vanderburgh School Corp. v. Moll,* 264 Ind. 356, 363, 344 N.E.2d 831, 837 (Ind.1976) ("The meaning of a contract is ascertained from a consideration of all its provisions, not from a consideration of individual words, phrases or paragraphs read alone.").

Paragraph 3 of the Agreement states: 3. If Dr. Cohen returns to the University following his sabbatical, he will be a Professor of Physics, *with tenure with the rights and responsibilities attendant to that position.* His salary will be ten-twelfths (10/12) of his current salary until he reaches age sixty five. As any other faculty member, Dr. Cohen will be eligible to receive yearly salary incre-

---

5. Bracketed text appears in original.

ments. In the event Dr. Cohen accepts employment elsewhere prior to age sixty-five, the University's obligations under this paragraph shall cease.

Appellant's Appendix at 456 (emphasis added). Paragraph 3 refers to the "rights and responsibilities attendant to" the position of a tenured professor. *Id.* The language does not in any way limit Cohen's responsibilities under the University's faculty handbooks. The clause at issue in Paragraph 3 reveals the parties' intent that Cohen be responsible for fulfilling those obligations which he would have been required to fulfill had he been a professor at the University whether or not he entered into the Agreement.[6] The responsibilities of members of the faculty at the University are set forth in the University's faculty handbooks.[7]

The Indiana University Academic Handbook included information related to a number of topics, including policies regarding academic appointments, annual reviews and promotions, plagiarism, and work condition policies (including travel, political activities, and conflicts of interest policies). The Indiana University Academic Handbook also contained the faculty's Constitution and included specific information regarding faculty governance, the function of the Faculty Review Board, the standards and procedures of the Faculty Review Board, and the University's Code of Academic Ethics (the "Code of Ethics"). The Code of Ethics contained a number of specific faculty responsibilities, including responsibilities related to testing and grading systems, availability to students and office hours, letters of evaluation, outside commitments and conflicts of interest, completion of records and data, criminal conduct, physical violence, destruction of University property, possession of firearms, possession of alcoholic beverages, falsifying information, occupation of University buildings, and rioting.

The Indiana University South Bend Academic Handbook[8] included additional information for faculty at IUSB, including guidelines for promotion, tenure and reappointment (including criteria and procedures), faculty work assignment requirements, salary guidelines and review process, sabbatical leave eligibility and guidelines, academic rules and regulations, and faculty-student relations policies (including policies regarding release of information in student records, consultation with students, and sexual and racial harassment).

**6.** Although referring to salary increments, the clause "As any other faculty member" in the third sentence of the same paragraph of the Agreement supports this interpretation. Appellant's Appendix at 456. *See General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 134 (Ind.Ct.App.1997) (finding the parties' intent was revealed in part by the location/placement of contract clauses within different sections of the contract), *reh'g denied, trans. denied; Kelly,* 611 N.E.2d at 121 (noting that the court is under an obligation to read an agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent).

**7.** The designated evidence reveals that Cohen believed that he remained subject to the policies and procedures set forth in the University's faculty handbooks. Cohen testified during his deposition that he believed the University's faculty handbooks were "incorporated in this [Agreement] by reference." Appellant's Appendix at 802. Cohen also argues that he "has alleged from the beginning" that his contract consisted of the Agreement, the Constitution of the Indiana University Faculty, and the IUSB Academic Handbook. Appellee's Brief at 13.

**8.** The Indiana University South Bend Academic Handbook provided that "policies about faculty in the Indiana University Academic Handbook, are followed by Indiana University South Bend." Appellant's Appendix at 420.

The Indiana University Academic Handbook provided that a faculty member may be dismissed for incompetence, serious personal or professional misconduct, or extraordinary financial exigencies of the University. Also, the possible sanctions for violation of the Code of Ethics included "reprimand, consideration in establishing annual salary, consideration in promotion decisions, consideration in tenure decisions, retention of salary, termination of employment, and immediate dismissal." Appellant's Appendix at 655.

Cohen returned to the University as a tenured professor "with the rights and responsibilities attendant to that position" in accordance with the terms of Paragraph 3 of the Agreement. *Id.* at 456. Cohen's responsibilities as a professor included those responsibilities that all professors at the University were required to fulfill and that were set forth in the University's faculty handbooks. The designated evidence supports this conclusion.[9] We cannot say that reasonable persons would differ as to the meaning of Paragraph 3 of the Agreement. We conclude that the Agreement was clear and unambiguous and that the trial court erred by concluding that Paragraph 3 of the Agreement was ambiguous.[10]

9. The designated evidence reveals that, when asked during his deposition about the meaning of the clause "having tenure with the rights and responsibilities attendant to that position," Cohen testified: "All of the things stated in the handbooks. Between those two documents [the Indiana University Academic Handbook and the Indiana University South Bend Academic Handbook], they're quite thorough in describing rights and responsibilities." Appellant's Appendix at 807.

10. Cohen also argues that a genuine issue of material fact existed as to whether he engaged in a "proven act of sexual harassment or retaliation" under Paragraph 10 of the Agreement. Appellee's Brief at 13. We observe that, contrary to the trial court's statement in its order denying summary judgment, Paragraph 10 of the Agreement does not "clearly limit[ ] the University's right to dismiss Cohen only for sexual harassment and retaliation." Appellant's Appendix at 2323 n. 2 (internal quotation marks and brackets omitted). Paragraph 10 of the Agreement provided that "any future proven act" of sexual harassment or retaliation by Cohen would "be considered serious personal misconduct and will result in immediate steps to dismiss Dr. Cohen from the faculty." *Id.* at 459. The Agreement does not state that no other conduct may constitute serious personal misconduct or that Cohen may not be dismissed for reasons other than sexual harassment or retaliation. In fact, as Cohen acknowledged during his deposition, "serious personal misconduct" was only one of several bases for faculty dismissal pursuant to the policies and procedures set forth in the Indiana University Academic Handbook. *See id.* at 655, 815–816. Cohen also acknowledged during his deposition that his employment could be terminated as a result of conduct that is not defined in Paragraph 10 of the Agreement. *See* Appellant's Appendix at 817 (when asked if Paragraph 10 of the Agreement was the only basis upon which his employment could have been terminated, Cohen replied: "The only basis with regard to this part [Paragraph 10] of the contract. Not the only basis with regard to the whole contract, because the academic handbook clearly outlines other provisions for somebody to be dismissed with tenure."). The Handbook and the Code of Ethics prohibited all faculty from engaging in a number of types of activity/conduct, such as plagiarism, physical violence, destruction of the University property, occupation of a University building, and rioting. When Paragraph 10 is read together with Paragraph 3, it is clear that the parties desired to expressly state or reiterate that the conduct of sexual harassment and retaliation constituted personal misconduct, but at the same time declined to limit or restrict those other rights or responsibilities Cohen may have had as a member of the University faculty. *See Kelly*, 611 N.E.2d at 121 (noting that the court is under an obligation to read an agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent).

Because we conclude that Paragraph 3 of the Agreement was clear and unambiguous in that it permitted the University to terminate Cohen's employment for his violation of the University's Code of Ethics as set forth in the Indiana University Academic Handbook, the University did not breach the Agreement by dismissing Cohen on that basis and the University was entitled to judgment as a matter of law. *See City of Hammond v. Plys*, 893 N.E.2d 1, 5 (Ind.Ct.App.2008) (reversing the denial of summary judgment because the trial court relied on an improper interpretation of a contract provision); *J.E. Stone Tree Service, Inc. v. Bolger*, 831 N.E.2d 220, 226 (Ind.Ct.App.2005) (reversing the denial of summary judgment in connection with breach of written contract); *Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1071–1072 (Ind.Ct.App.2001) (reversing the denial of summary judgment after concluding that contract language was not ambiguous), *trans. denied; TRW, Inc. v. Fox Dev. Corp.*, 604 N.E.2d 626, 633 (Ind.Ct.App.1992) (reversing the denial of summary judgment because construction contract language was unambiguous and no breach of contract occurred), *reh'g denied, trans. denied.*

For the foregoing reasons, we reverse the trial court's denial of the University's motion for summary judgment and remand with instructions to enter summary judgment in favor of the University on Cohen's Complaint.

Reversed and remanded.

CRONE, J., and BRADFORD, J., concur.