**FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, Appellant–Defendant,**

v.

**Rhys MUSSMAN and Sally Mussman, husband and wife, Appellees–Plaintiffs.**

**No. 64A03–0905–CV–204.**

Court of Appeals of Indiana.

July 14, 2010.

Scott J. Fandre, Carl A. Greci, Baker & Daniels LLP, South Bend, IN, Attorneys for Appellant.

Tara K. Tauber, David W. Westland, Tauber Westland & Bennett P.C., Schererville, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Fidelity National Title Insurance Company ("Fidelity") appeals from the trial court's grant of summary judgment in the amount of $1.6 million in favor of Rhys and Sally Mussman ("the Mussmans") on the Mussmans' complaint alleging conversion of funds held in an escrow account by Intercounty Title Company ("ITC"). The question presented is whether ITC was acting as Fidelity's agent when it provided closing and escrow services for the Mussmans. We hold that while ITC was Fidelity's title insurance agent, ITC was not Fidelity's agent for closing and escrow services, and, thus, that the trial court erred when it held that the Mussmans are entitled to judgment as a matter of law.

We reverse and remand with instructions.[1]

### FACTS AND PROCEDURAL HISTORY

On January 1, 1997, Fidelity entered into an Issuing Agency Agreement ("the Agreement") with Intercounty Title Company ("ITC"), under which ITC was authorized to countersign and issue title insurance commitments and policies for Fidelity in Indiana. The Agreement provided in relevant part as follows:

 1. APPOINTMENT AND AUTHORITY OF AGENT

 Company [Fidelity] appoints Agent [ITC] *solely* to countersign and issue title insurance commitments, binders, guarantees, endorsements, title insurance policies of Company, or any other form whereby Company assumes liability (collectively, "Title Assurances") in Agent's Territory set forth in Schedule A.

 2. RESPONSIBILITY OF AGENT

 A. Affirmative Covenants. Agent shall:

 1. Receive and process applications for Title Assurances. . . .

 \* \* \*

 3. Make available for examination by Company, at any time during normal business hours and with reasonable prior notice from Company during the term of this Agreement, all financial records and records relating to the issuance of Company's Title Assurances by Agent.

 \* \* \*

 5. Permit Company and its examiners, auditors, and independent certified public accountants to enter Agent's business premises for the purpose of inspecting same or performing escrow, procedural, technical or forms audits upon reasonable notice to Agent.

 \* \* \*

 7. Obtain Company's prior approval where funds are to be held under an escrow and/or indemnity agreement involving any single title risk in excess of $10,000 in order to facilitate the issuance of a Title Assurance without exception to or with affirmative coverage over a specific defect, lien or encumbrance. The funds and property held under any such escrow and/or

---

1. We heard oral argument in this case on April 21, 2010. We commend counsel for their excellent oral advocacy.

indemnity agreement, together with the original documents evidencing the escrow/indemnity, shall be transferred to Company on request of Company.

8. Keep safely and segregated, in an FDIC insured escrow/trust account, which is subject to audit by Company, all monies that may be entrusted to Agent by Company, or others, in the course of: (i) Agent's business operations; and, (ii) the issuance of Company's Title Assurances hereunder. Agent shall exercise a fiduciary duty with respect to the owners of the funds so deposited. *Agent shall be solely liable for any and all losses arising by reason of Agent's improper, unauthorized, reckless or premature disbursement of any escrow funds.*

\* \* \*

B. Negative Covenants. Agent shall not, without the prior written approval of Company's corporate underwriting department:

\* \* \*

6. Receive any funds including escrow, settlement or closing funds, in the name of the Company, *but shall receive funds solely in Agent's name.*

7. Use Company's name in any manner inconsistent with the terms and conditions of this Agreement.

\* \* \*

6. ALLOCATION OF LOSSES

\* \* \*

B. In the event that a Loss sustained or incurred for a matter arising under this Agreement resulted or arose from the negligent, willful or reckless conduct of Agent, Agent's employees or any independent contractor relied upon by Agent, then *Agent shall reimburse company for*

*the Loss.* The instances where Agent shall be liable to Company under this subparagraph shall include, without limitation, the following:

\* \* \*

3. *Loss arising from escrow or Non–Title Assurance operations* of Agent including, but not limited to, preparation of documents, providing abstracting services, providing accommodation services and the handling and disbursement of funds.

Appellant's App. at 118–19 (emphases added). Nothing in the Agreement required that ITC conduct closing and escrow services in connection with the issuance of Fidelity title insurance policies.

In 1999, the Mussmans, who owned real estate in Porter County, contracted to sell that real estate to Floramo Partners, Ltd. ("Floramo") for $1.6 million. The Mussmans agreed to purchase and provide to Floramo both owner's and mortgagee's title insurance policies insuring title to the real estate, and the purchase agreement provided that ITC would issue those policies. ITC also acted as closing agent and escrow agent for the Mussmans and Floramo. Fidelity did not have any contact with the Mussmans or Floramo during the course of the transaction, and Fidelity's name does not appear on the closing documents or title insurance commitments issued for Floramo. Shortly after closing on December 30, 1999, ITC issued title insurance policies, underwritten by Fidelity, to Floramo and Floramo's mortgagee, Suburban Bank.

Thereafter, in March 2000, Fidelity grew suspicious of ITC's business practices and imposed additional escrow account supervision beyond that provided for in the Agreement. The additional procedures required that Fidelity give prior approval for all operating account disburse-

ments and wire transfers out of escrow accounts. Fidelity ultimately terminated its Agreement with ITC after an audit found irregularities in ITC's escrow account.

On April 30, 2000, the Mussmans negotiated a check for $1.6 million drawn on ITC's escrow account and discovered that there were insufficient funds to pay the check. The Mussmans eventually learned that the funds that had been in the ITC escrow account at the time of their closing in December 1999 had been stolen by ITC owner Lawrence Capriotti and others as part of a Ponzi-like scheme to loot millions of dollars from real estate escrow accounts maintained by ITC and its affiliates. Capriotti and his partner James Hargrove were ultimately convicted of several counts of fraud and, in May 2006, Capriotti and Hargrove were each sentenced to fourteen years in federal prison.

Further investigation revealed that on January 6, 2000, the escrow funds meant for the Mussmans had been wire-transferred from ITC's escrow account at National City Bank of Munster to an escrow account in an Illinois bank in the name of an ITC affiliate. Those funds were not returned, and, thus, there were insufficient funds in the ITC escrow account to cover the check issued to the Mussmans.

The Mussmans filed a complaint alleging conversion and theft by ITC and Capriotti, and an amended complaint alleging negligence by Fidelity.[2] In addition, the Mussmans alleged that Fidelity is liable to them for ITC's conduct under the principles of respondeat superior and under § 261 of the Restatement (Second) of Agency. The Mussmans filed a motion for summary judgment on July 21, 2008, and Fidelity filed a response and cross-motion for summary judgment. Following a hearing, the trial court denied Fidelity's cross-motion for summary judgment and entered summary judgment in favor of the Mussmans. This appeal ensued.

## DISCUSSION AND DECISION

We review a summary judgment order de novo. *Bules v. Marshall County*, 920 N.E.2d 247, 250 (Ind.2010). The purpose of summary judgment is to end litigation about which there can be no factual dispute and which may be determined as a matter of law. *Shelter Ins. Co. v. Woolems*, 759 N.E.2d 1151, 1153 (Ind.Ct.App. 2001), *trans. denied.* We must determine whether the evidence that the parties designated to the trial court presents a genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Bules*, 920 N.E.2d at 250. We construe all factual inferences in the nonmoving party's favor and resolve all doubts as to the existence of a material issue against the moving party. *Bules*, 920 N.E.2d at 250.

Fidelity contends that the trial court erred when it concluded that the Mussmans are entitled to judgment as a matter of law. In particular, Fidelity maintains that its agency agreement with ITC pertained only to the issuance of title insurance. Thus, Fidelity contends, ITC was not Fidelity's agent for the closing or escrow services that led to the conversion of the Mussmans' funds, and Fidelity is not liable to the Mussmans.

**▬** Whether ITC was acting for and on behalf of Fidelity when it provided closing and escrow services for the Mussmans

2. The Mussmans did not know that Fidelity had provided the title insurance policies when they filed their initial complaint. They added Fidelity as a defendant in their amended complaint filed on April 27, 2001. The amended complaint also sought treble damages and attorney's fees from Fidelity under Indiana Code Section 34–24–3–1.

turns on the scope of ITC's authority as agent. The two main classifications of an agent's authority are "actual authority" and "apparent authority." *Gallant Ins. Co. v. Isaac,* 751 N.E.2d 672, 675 (Ind. 2001). Actual authority is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. *Id.* The focus of actual authority is the belief of the agent. *Scott v. Randle,* 697 N.E.2d 60, 66 (Ind.Ct.App. 1998), *trans. denied.* Actual authority may be express or implied and may be created by acquiescence. *Id.*

 On the question of apparent authority, here there was no assurance, conduct or other communication by Fidelity that the Mussmans could have relied upon to believe there was an agency relationship between Fidelity and ITC. Such a manifestation by the principal is necessary to support a reasonable belief and inference of apparent authority. *See Pepkowski v. Life of Indiana Ins. Co.,* 535 N.E.2d 1164, 1166–67 (Ind.1989); *see also* Restatement (Third) of Agency § 2.03 (2006). The Mussmans concede that the designated evidence does not show that ITC had apparent authority to conduct escrow or closing services on Fidelity's behalf.[3]

 But the Mussmans contend that ITC had actual authority as Fidelity's agent to close the transaction. In particular, the Mussmans argue that it is implicit in the Agreement and the conduct of the parties that ITC acted on behalf of Fidelity in conducting escrow and closing services. They aver that "[b]ecause Fidelity chose not to deal directly with parties to real estate transactions occurring in Indiana, Fidelity could not have issued ti-

tle insurance policies in Indiana without ITC . . . providing closing and escrow services." Brief of Appellees at 24. Further, the Mussmans emphasize that Fidelity had and exercised the right to audit ITC's closing records and escrow accounts. The Mussmans contend that such evidence proves that ITC had implied actual authority to conduct escrow and closing services as Fidelity's agent.

 We must first consider the express terms of the Agreement. A contract is not ambiguous merely because the parties disagree as to its proper construction. *Trustees of Indiana University v. Cohen,* 910 N.E.2d 251, 257 (Ind.Ct.App.2009). When this court interprets an unambiguous contract, we must give effect to the intentions of the parties as expressed in the four corners of the instrument. *Id.* Clear, plain, and unambiguous terms are conclusive of that intent. *Id.* This court will not construe clear and unambiguous provisions, nor will we add provisions not agreed upon by the parties. *Id.* In interpreting an agreement, the court is under an obligation to read the agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent. *Id.*

Here, the Agreement includes a section entitled "Appointment and Authority of Agent," which states unambiguously that Fidelity appointed ITC "*solely* to countersign and issue title insurance commitments, binders, guarantees, endorsements, title insurance policies [, or any other form of title assurances]." Appellant's App. at 118 (emphasis added). The section entitled "Responsibility of Agent" includes various affirmative and negative covenants which more specifically limit the scope of

---

**3.** Because the issue of apparent authority is no longer disputed, we need not address the applicability of Section 261 of the Restatement (Second) of Agency. We note, however, that Section 7.08 of the Restatement (Third) of Agency has superseded Section 261.

ITC's agency. *Id.* These provisions state, in relevant part, that Fidelity retains the right to examine ITC's financial records and records relating to ITC's issuance of title assurances, that ITC's escrow account is subject to audit by Fidelity and that ITC shall not "[r]eceive any escrow, settlement or closing funds in the name of [Fidelity], but shall receive funds solely in [ITC's] name." *Id.* And under another section entitled "Allocation of Losses," ITC is specifically liable to indemnify Fidelity from a loss related to the issuance of title assurances, as well as from a "[l]oss arising from escrow or Non–Title Assurance operations."

The Mussmans maintain that Fidelity's right to audit ITC's closing records and escrow accounts and ITC's obligation to indemnify Fidelity indicate that · Fidelity was the principal and ITC was the agent in closing their transaction with Floramo. But these and other provisions throughout the Agreement merely define the contract rights and responsibilities of the parties. As we have already noted, and of singular importance, the Agreement expressly limits the scope of ITC's agency. The Agreement also limits Fidelity's responsibility. Numerous provisions taken individually and collectively demonstrate that Fidelity agreed to provide title insurance coverage and to be liable for any losses covered under its policies while ITC agreed to be responsible for any loss arising from its acts, errors or omissions, whether as Fidelity's title insurance agent or on its own account.

The Mussmans rely on *Lawyers Title Ins. Corp. v. Phillips Title Agency*, 361 F.Supp.2d 443 (D.N.J.2005), to support their contention that ITC was Fidelity's agent for closing and escrow services. As in this case, in *Lawyers Title* the agency agreement between Lawyers Title and Central Title did "not specifically require that Central Title perform real estate sale closings." *Id.* at 446. The court observed, however, that the terms of the agreement anticipated that Central Title "may conduct closings due to the circumstances of a particular transaction or as a result of local custom, such as the practice in southern New Jersey of having a title agent handle the closing." *Id.* And the court simply concluded that "[t]he Agreement thus acknowledges that Central Title acts on Lawyers Title's behalf and conducts Lawyers Title's business in performing a closing." *Id.* But this summary conclusion was not an adjudication of a contested issue and is not precedent. In *Lawyers Title*, the contested issue decided by the court was not whether Central Title was Lawyers Title's agent for closing purposes but whether Central Title was liable for the acts of its subagents.

Here, in contrast, while the parties contemplated that ITC would provide closing and escrow services, the text of the Agreement expressly limits ITC's agency to the issuance of title insurance commitments and policies and, further, provides that ITC was not to receive any funds "including escrow, settlement or closing funds" in Fidelity's name. Appellant's App. at 118. In *Lawyers Title*, there was no such contractual limitation on Central Title's agency. Questions of agency are always fact-sensitive, and we find nothing in the circumstances of this particular transaction or any evidence of local practice that would obviate the plain meaning of the Agreement between Fidelity and ITC.

This is a case of first impression in Indiana, but courts in other states have considered the question whether a title insurance agent is also an agent of the title insurance company with respect to escrow and closing services, and these cases from other jurisdictions provide guidance on how to address the question presented

here. In *Southwest Title Insurance Co. v. Northland Building Co.*, 552 S.W.2d 425 (Tex.1977), a title insurance company was sued over a real estate closing, and one question presented was whether the company was liable for the acts of its agent in closing the transaction. The company's agent, an attorney, endorsed the plaintiff's check payable to the company, deposited the funds in his trust account, and disbursed the funds according to plan. The trial court entered judgment on a jury verdict against the company, based in part on a finding that the attorney was acting as an agent of the company when he endorsed the check and that the company had ratified his agency by accepting the benefits of the real estate transaction. *Id.* at 428. The Texas Court of Civil Appeals affirmed, but the Texas Supreme Court reversed, noting that, "The arguments in this case confuse the closing of a title insurance contract and the closing of the entire transaction[.]" *Id.* at 428. The court held, in part, that there was no evidence the title insurance company conducted any business other than the issuance of title insurance, or that its agent had any more authority from the company than to close on the issuance of its title policy, and that the only benefit the company received was the title insurance premium. *Id.* Thus, in *Northland,* the court held that the agent was not the company's agent for closing the transaction and that the company was not liable for the forged estoppel letters at issue.

Likewise, in *Proctor v. Metropolitan Money Store Corp.*, 579 F.Supp.2d 724 (D.Md.2008), the United States District Court considered whether two title insurance companies were liable as principals for settlement and closing services provided by their agents. The court observed that, "The employment of an agent for purposes of issuing title insurance does not (at least by itself) establish an agency rela-

tionship for purposes of settlement and closing activities undertaken by that title agent." *Id.* at 736. The Court invoked the following general rule:

> [A]n issuing [title insurance] agent may, in accordance with an agency contract, wear "two hats," one as an *agent* to issue or sell title insurer's insurance policies, and the other as a settlement agent to conduct closings *on his or her own behalf.* In such cases, the title insurer is responsible only for the title insurance issue; it cannot be held liable for the agent's participation in related closings or provision of escrow services.

*Id.* (quoting *Nat'l Mortgage Warehouse, LLC v. Bankers First Mortgage Co.,* 190 F.Supp.2d 774, 780 (D.Md.2002)) (emphasis added). The court then reasoned that general requirements imposed by title companies, "concerning the basic structure of escrow accounts, the need for monthly reconciliations, access for audits, and indemnification, although indicia of some level of control by the title insurers, are primarily geared toward minimizing risk of a loss under the title insurance policy." *Id.* at 739. In *Proctor,* the court concluded that:

> In the end, the title agents here retained a tremendous amount of discretion on a day-to-day basis in the provision of settlement and closing services and were not acting primarily for the benefit of the title insurer in those activities.... Rather the allegations set forth by the Plaintiff illustrate precisely the relationship seen in *National Mortgage* [190 F.Supp.2d at 774] and other cases in which the settlement agents wear two hats, only one of which—his or her role in the provision of title insurance—involves a general agency relationship with the title insurance company suffi-

cient to establish vicarious liability to any plaintiff.

*Id.*

Here, again, the Mussmans contend that the audit and indemnification provisions in the Agreement demonstrate the extent to which Fidelity controlled ITC, but we conclude that as in *Northland* and *Proctor,* Fidelity's authority to audit ITC's escrow accounts does not convert ITC's limited agency to issue title insurance commitments and policies into a broader general agency in which Fidelity has vicarious liability as the principal. An audit occurs after the fact to verify that the transaction occurred as contemplated and to verify the risk assumed under the policy issued. Fidelity's right to conduct audits does not mean that Fidelity controlled or directed how ITC conducted its closing and escrow services. And there is no suggestion that ITC did not retain "discretion on a day-to-day basis in the provision of [those] services[.]" *See id.*

We conclude that neither the indemnification provisions in the Agreement, nor ITC's issuance of policies and collection and remittance of premiums confers a sufficient benefit upon Fidelity to establish a general agency relationship that does not otherwise exist. Thus, we agree with the court in *Proctor* that the primary purpose for general escrow account requirements, including reconciliation, access for audits, and indemnification, is to minimize the risk of loss under the title insurance policies, and even allegations of vicarious liability like the ones raised in this case. *See Proctor,* 579 F.Supp.2d at 739. And here, as with Southwest Title in *Northland,* there is no evidence that Fidelity conducted any business other than the issuance of title insurance, or that ITC had any more authority from Fidelity than to issue its policies, and the only benefit Fidelity re-

ceived was the title insurance premium. *See Northland,* 552 S.W.2d at 428.

As we have already noted, the Mussmans contend that "Fidelity could not have issued title insurance policies in Indiana without ITC ... providing closing and escrow services." Brief of Appellees at 24. But there is nothing in the Agreement showing that Fidelity and ITC intended that ITC would conduct, or was required to conduct, closing and escrow services as Fidelity's agent. ITC's authority to issue title insurance commitments and policies underwritten by Fidelity was not tied to or contingent upon any particular closing or escrow arrangement. There is no designated evidence showing that Fidelity directed the manner in which ITC would conduct its closings, and there is no evidence that Fidelity chose ITC to conduct the parties' closing here. Rather, it appears that the Mussmans and/or Floramo chose ITC. As the Settlement Statement reveals, the Mussmans and Floramo paid ITC a "Settlement or closing fee" for its services, and that fee was not shared with Fidelity. Appellant's App. at 139. Significantly, ITC would not have violated any terms of the Agreement, and ITC could have issued the same Fidelity title policies, had the parties chosen a real estate firm, attorney, or financial institution to conduct the closing.

Even assuming, as the Mussmans contend, that the Agreement and the conduct of the parties imply actual authority, it is well settled that a determination of actual authority focuses on the belief of the agent. *See Scott,* 697 N.E.2d at 66. As the Mussmans acknowledged at oral argument, there is no designated evidence showing whether ITC believed that it had authority to conduct escrow or closing services on Fidelity's behalf. Without any such evidence, the Mussmans cannot establish the existence of a question of fact

on the issue of [implied] actual authority. *See, e.g., Crawfordsville Square, L.L.C. v. Monroe Guar. Ins. Co.,* 906 N.E.2d 934, 941 (Ind.Ct.App.2009) (holding appellant not entitled to summary judgment because no designated evidence showed genuine issue of material fact), *trans. denied.*

In sum, the parties agree that the designated evidence does not support a determination that ITC had apparent authority to conduct closing and escrow services as Fidelity's agent. And the designated evidence does not support a determination that ITC had actual authority, either express or implied, to conduct closing and escrow services on Fidelity's behalf. The trial court erred when it concluded that the Mussmans are entitled to judgment as a matter of law and denied Fidelity's cross-motion for summary judgment. We hold that Fidelity is entitled to summary judgment on the Mussmans' complaint and instruct the trial court to issue judgment for Fidelity accordingly.

Reversed and remanded with instructions.

VAIDIK, J., and BROWN, J., concur.