

FILED
Mar 16 2016, 8:37 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Jeffrey P. Smith | P. Adam Davis |
| Hawk, Haynie, Kammeyer | Davis & Sarbinoff, LLC |
| & Smith, LLP | Indianapolis, Indiana |
| Fort Wayne, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Edward P. Kramer, | March 16, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 29A04-1508-PL-1089 |
| v. | Appeal from the Hamilton Circuit Court |
| Focus Realty Group, LLC, successor in interest to AES Restaurants, LLC, | The Honorable Paul A. Felix, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 29C01-1302-PL-1639 |

**Baker, Judge.**

[1]    Over two decades ago, our Supreme Court held that attorneys are entitled to rely upon the representations of other attorneys. *Fire Ins. Exch. v. Bell by Bell*, 643 N.E.2d 310 (Ind. 1994). Today, we reiterate that principle and affirm the decision of the trial court.

[2]    Edward Kramer appeals the trial court's award of summary judgment, which found him liable to Focus Realty Group, LLC ("Focus"), for breach of contract. Focus was contractually entitled to purchase a parcel of real estate for a certain price, which was to be calculated by adding a percentage of the then current annual net lease of one of the buildings to a base amount. When Focus's attorney asked for the current monthly lease so that he could calculate the price, Kramer's attorney responded with a figure $400 higher than the lease actually was. This resulted in a $40,000 increase over the correct purchase price. We find that Focus was entitled to rely upon the representations of Kramer's attorney, and that Focus was entitled to mitigate its damages by going forward with the contract and suing for damages later.

## Facts

[3]    In November 2009, AES Restaurants, LLC ("AES"), Kramer, and Millie One, Inc., entered into a contract ("the 2009 Agreement") regarding some real estate located in Bluffton, Wells County. Under the 2009 Agreement, Kramer and Millie One agreed to sell an Arby's to AES and to lease the premises of the restaurant to AES. The 2009 Agreement also granted AES an option to purchase ("the Option"); AES could exercise the Option to purchase the entire

parcel of real estate on which the restaurant was located. The parcel included two buildings: in addition to the restaurant, there was a building on the south side of the parcel. The parties agreed that if AES exercised the Option, "[t]he purchase price . . . shall be $400,000.00 plus twelve percent (12%) of the then current annual net lease of the South Building." Appellant's App. p. 91.

[4] On April 30, 2012, AES's successor in interest, Focus, notified Kramer of its intent to exercise the Option. Focus's attorney, Adam Davis, mentioned the $400,000 base of the purchase price, and then made the following request: "please provide me with the current lease for the South Building so that I may determine the remainder of the purchase price." *Id.* at 18.

[5] Kramer's attorney, W. Randall Kammeyer, responded by saying that "there are some major open items that need to be resolved before we proceed forward." *Id.* at 21. First, Kammeyer alleged that the current occupant of the restaurant was not paying enough taxes. He then wrote, "the *rental value* is now $1,600.00 a month which equates to $19,200.00 annually. . . . Therefore, the purchase price should be $560,000, not the $400,000 that is in the Agreement." *Id.* (emphasis added).

[6] Davis responded that he thought the taxes were irrelevant to the formula for the purchase price. Kammeyer told him that the taxes would affect the net value of

the rent, and then raised the purchase price to $575,000.[1] When Davis asked why the purchase price was increased by $15,000 from the previous email, Kammeyer responded by saying the purchase price was now $580,000, explaining the newest $5,000 increase was owing to a release of legal claims. Davis responded that a $5,000 increase over the first $560,000 purchase price would only be $565,000. Eventually, the parties set the purchase price at $564,500.

[7] The parties signed a purchase agreement ("the Bluffton Purchase Agreement") on July 13, 2012. The Bluffton Purchase Agreement provided that Focus would have one month to conduct due diligence, and that closing would occur roughly one month after that.

[8] On September 10, 2012, two days before the parties were set to close, Kammeyer emailed Davis regarding the rent being paid by the tenant in the South Building. The email mentioned the fact that the then current lease was only $1,200, a significantly lower figure than the $1,600 the parties had been using for calculations. Davis requested a copy of the then current lease and confirmed that the South Building was being rented for $1,200.

[9] This set off a flurry of emails. Davis realized that, despite the fact that the Option had contractually set the purchase price according to a percentage of

---

[1] We are not sure how taxes could *increase* the "net value" of a lease; any tax could only decrease what the landlord would net from rental payments. We are assuming, of course, that Bluffton and Wells County do not impose a negative tax rate on property owners.

"the then current annual net lease," Kammeyer had instead responded with his own estimate of "the rental value." Kammeyer said he arrived at a "rental value" of $1,600 because he believed he could potentially rent out more space in the South Building.

[10] Davis strenuously objected, arguing that the purchase price should only be $520,000. Davis and Focus were not arguing from a position of strength, however: they had lined up a large financing deal with third parties that depended on closing according to schedule. Accordingly, Kramer refused to reduce the purchase price and stated that if closing did not happen that day, it would not happen at all. Focus decided to close the deal, but made its displeasure known:

> As such, I am faced with a predicament: To Close or Not to Close. If we close, it is possible that we will run the risk of being able to recover later, but the benefits would be that we mitigate damages. Specifically, if we don't close, both of you would be liable for a great deal more than $40K AND a lot of damage would be suffered by parties other than just my client.

Appellant's App. p. 223.

[11] To exacerbate this dilemma, Kramer placed an integration clause into the closing documents, and also showed up to the closing with a Release Form that purported to release him from any claims. Kramer refused to close unless Focus signed those documents. The deal closed on September 13, 2012, for the price of $564,500.

On February 19, 2013, Focus filed a lawsuit alleging a breach of contract and fraud, seeking to recover the $40,000 overage. Focus moved for summary judgment, and Kramer responded with a cross-motion for summary judgment. Following a hearing, the trial court granted summary judgment to Focus on its breach of contract claim, but denied summary judgment on its fraud claim. After Focus's petition for damages and Kramer's response, the trial court awarded $40,000 plus prejudgment interest to Focus. Kramer now appeals.

# Discussion and Decision

## I. The Contract

Kramer has two arguments as to why the trial court erred. First, he argues that the parol evidence rule should have prohibited the trial court from considering the Option contract. Second, he argues in the alternative that the formula to determine the purchase price was ambiguous, and that whether Kammeyer's interpretation of the formula was reasonable constituted a material question of fact, rendering summary judgment inappropriate.

When reviewing a trial court's ruling on summary judgment, we stand in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse. *AutoXchange.com, Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 47 (Ind. Ct. App. 2004). Therefore, we look to whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). When faced with cross-motions for summary judgment, we consider each motion separately to determine whether

the moving party is entitled to judgment as a matter of law. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. Ct. App. 2000). Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Trustees of Ind. Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009).

[15] Initially, we must digress to discuss the parties' calculation of the purchase price pursuant to the Option. The formula set out by the Option is "$400,000.00 plus twelve percent (12%) of the then current annual net lease of the South Building." Kramer renders this numerically as follows: 400,000 + [ (1,600 * 12) / .12 ] = 560,000. Appellee's Br. p. 10. But to arrive at twelve percent of the annual lease, one should *multiply* by .12, not *divide* by .12. Dividing by .12 is equivalent to using 833.3% of the annual net lease, rather than 12%. It appears that Kramer substituted a different formula to calculate the asset value, one which assumed a "capitalization rate" of .12: [Asset Price] = [Annual Net Income / Capitalization Rate]. This result was then added to $400,000. Although this capitalization rate formula is commonly used to value real estate transactions, it was not actually called for in the Option.

[16] Focus has apparently consented to use the formula that divides by .12 rather than the formula they were entitled to use by the Option, which would multiply by .12. Focus only argues that the 1,600 should be 1,200. A correct rendering of the formula, as stated literally in the Option, would be as follows: 400,000 + [ (1,200 * 12) * .12 ] = 401,728. But since both parties have agreed to substitute

the "capitalization rate" approach for what is actually written in the Option, we will treat the "capitalization rate" calculation as the correct one.

[17] We turn to Kramer's first argument. He is correct to note that, in general, where the parties to an agreement have reduced the agreement to a written document and have included an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract. *Krieg v. Hieber*, 802 N.E.2d 938, 943 (Ind. Ct. App. 2004). But parol evidence may be considered if it is not being offered to vary the terms of the written contract, and to show that fraud, intentional misrepresentation, or mistake entered into the formation of a contract. *Id*. In addition, parol evidence may be used to shed light upon the circumstances under which the parties entered into the written contract. *Id.*

[18] We believe, at the very least, that the Option contract was properly before the trial court to shed light upon the circumstances under which the parties entered into the contract. The trial court was certainly not required to ignore the following facts:

- the parties entered into a binding option contract under which Focus could purchase the parcel;
- the purchase price depended on the "then current annual net lease," appellant's app. p. 91;
- Davis asked Kammeyer for a copy of the then current lease;
- instead of providing a copy of the lease, Kammeyer represented the South Building as having a "rental value" of $1,600;

- Kammeyer then used this "rental value" in place of the "then current annual net lease" to calculate the purchase price, which he represented as $560,000;
- Kammeyer allowed Focus to arrange complex financing around the deal without informing it of the current lease price;
- Kammeyer only disclosed the true current lease value a mere two days before Focus had to close the deal, at which time it was too late for Focus to back out without incurring significant damages.

Kramer's argument—that the trial court was required to look past the tactics he used to negotiate this deal—is simply unavailing.

[19] As to Kramer's second argument, we do not agree that the terms of the Option contract created an issue of fact; indeed, we find the terms to be completely unambiguous. Kramer directs our attention to the words, "then current annual net lease." He argues that the emails going back and forth regarding the final price demonstrates that the parties disagreed over the meaning of that term. But terms of a contract are not ambiguous merely because controversy exists between the parties, each favoring an interpretation contrary to the other's. *Anderson v. State Farm Mut. Auto. Ins. Co.*, 471 N.E.2d 1170, 1172 (Ind. Ct. App. 1984). Our inquiry instead is whether reasonably intelligent people would honestly differ as to the term's meaning. *Id.*

[20] In this case, reasonably intelligent people could not honestly differ. The phrase "then current annual net lease" clearly refers to the lease then in place—it certainly could not be construed to mean the rental value that could hypothetically be obtained if different or additional tenants were leasing the building. Additional leases that do not yet exist are the exact opposite of "then

current" leases. Kramer is attempting to invent an ambiguity where there is none.

[21] Pursuant to the Option, Kramer was contractually obligated to sell the property to Focus for a certain price; instead, he sold the property to Focus for $40,000 more than that price. It is entirely appropriate that he return that windfall, with interest.

## II. Attorney Conduct

[22] Finally, we would like to say a few words about the attorneys' conduct in this case. A strong argument can be made that Davis should have demanded a copy of the current lease from the outset of negotiations, rather than accept the $1,600 figure provided by Kammeyer. Davis then would have known that he was entitled to the $520,000 purchase price, and if Kammeyer had tried to negotiate a higher price, Davis could, as a last resort, sue for specific performance on the Option.

[23] But we do not believe that Davis was required to take this course of action. As our Supreme Court has explained, "[t]he reliability and trustworthiness of attorney representations constitute an important component of the efficient administration of justice. A lawyer's representations have long been accorded a particular expectation of honesty and trustworthiness." *Bell*, 643 N.E.2d at 312. In that case, the Court rejected the argument that an attorney "had no right to rely on the representations he claims because he had the means to ascertain relevant facts, was in an adverse position, was educated, sophisticated, and not

involved in any dominant-subordinate relationship." *Id.* at 313. Instead, it "decline[d] to require attorneys to burden unnecessarily the courts and litigation process with discovery to verify the truthfulness of material representations made by opposing counsel," and held, as a matter of law, that attorneys are entitled to rely upon the representations of other attorneys. *Id.*

[24] Given that Davis was entitled to rely upon the inaccurate information about the current net lease, we believe that he was entitled to choose between two courses of action upon finding out the true figure. He could have stopped the deal, cancelled the Bluffton Purchase Agreement, and sued for specific performance on the Option. But, as he recognized, this would have entailed significant costs. He instead chose the other course of action: he mitigated his damages by going through with the deal, and sued to collect the overage afterwards. We cannot fault him for choosing the course of action that he did.

[25] The judgment of the trial court is affirmed.

Bradford, J., and Pyle, J., concur.