**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JOHN P. BULLMAN**
Bullman Law Office
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**CHRISTOPHER M. FORREST**
Forrest Legal, LLC
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| THE MATTER OF THE ADOPTION OF M.S.T., a minor, | ) |
| | ) |
| R.P.M.T., | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )   No. 02A03-1106-AD-258 |
| | ) |
| C.K. and J.P., | ) |
| | ) |
| Appellees-Petitioners. | ) |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D07-1003-AD-55

**February 22, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

R.P.M.T. ("Father") appeals the trial court's granting a petition to adopt his son, M.S.T., filed by C.K. and J.P. (collectively "the Petitioners"). We affirm.

## Issues

Father raises four issues, which we consolidate and restate as whether the trial court properly concluded that his consent to the adoption was not required because he knowingly failed to provide for the care and support of M.S.T.

## Facts

M.S.T. was born on December 1, 2000, in Illinois. At that time, Father was married to M.S.T.'s mother, T.T. ("Mother").[1] In November 2002, because of concerns about M.S.T.'s delayed speech, Father and Mother agreed that M.S.T. would live in Fort Wayne with C.K., Father's maternal aunt, and her partner J.P., a clinical specialist in speech language pathology. The parties agreed that the Petitioners would care for M.S.T. until he was school-aged.

In December 2002 and May 2003, Father and Mother executed "child care authorization letters" drawn up by the Petitioners' attorney. Ex. 3, 4. The December letter granted C.K. the authority to temporarily care for M.S.T., and the May letter granted C.K. and J.P. the authority to temporarily care for M.S.T. The letters were "[e]ffective until terminated by the parent." Id.

---

[1] Mother has not had any significant communication with M.S.T. since 2002, and is not a party on appeal.

In the fall of 2003, Father and Mother got divorced, and Father asked C.K. to keep M.S.T. more permanently. On December 19, 2003, during divorce proceedings, an Illinois court issued an order acknowledging M.S.T. had been placed with C.K. by the agreement of Father and Mother, awarding Father custody of M.S.T., and permitting Father to place M.S.T. with C.K. for guardianship purposes. However, no legal guardianship was ever established.

M.S.T. remained with C.K., whom he referred to as his aunt, and J.P., whom he referred to as his mom. Father and Father's mother, M.T., who is C.K.'s sister, would visit M.S.T. in Fort Wayne, and the Petitioners would take M.S.T. to Illinois to visit Father and M.T.

In early 2010, Father requested that M.S.T. be returned to him. On March 26, 2010, the Petitioners filed a petition to adopt M.S.T. Father contested the adoption. On April 21, 2011, after a hearing, the trial court concluded that Father's consent to the adoption was not required and granted the adoption petition. The trial court found in part:

> 17. The father is vision impaired and is unable to operate a motor vehicle. He therefore relies on others, primarily [M.T.], to [sic] his transportation to and from work. He also suffers from other physical challenges. He is hydrocephalic and suffers from seizures that are largely controlled with medication. Possible owing to these circumstances, the father's personality and behavior is rather isolated. The father's conversation and engagement with others is limited during visits with [M.S.T.] and other family members.
>
> 18. Notwithstanding the above recited circumstances, the father is in good athletic condition and is employed through Goodwill Industries at the Great Lakes Naval Center. He has

3

been employed through-out the time that [M.S.T.] has lived with Petitioners. He currently earns approximately $30,000.00 per year[.]

19. The father's income is managed by his mother. From his earnings, [M.T.] pays the father's bills, purchases his groceries, and places a portion in a joint savings account.

20. The Father resides in a two bedroom duplex owned by him and his mother for which he pays her rent. The other side of the duplex is leased by a tenant.

21. The father engages in few activities and there are limited demands on his income. He describes a daily routine of going to work, followed by a nap. His day also includes weight lifting and a physical workout on a treadmill.

22. The father has not provided for [M.S.T.'s] care and support since the child's placement with Petitioners. He acknowledges that he has a duty to provide for the child.

23. [M.T.] testified that support was offered to the Petitioners but declined on two occasions in the eight and one-half years [M.S.T.] has been in their care. Her testimony is disputed by the Petitioners.

24. The first of the two offers to provide support, as asserted by [M.T.], was made to [C.K.] in a telephone call during a recess from the December 19, 2003, Illinois court hearing. [C.K.] denies receiving any call from [M.T.] and the resulting order makes no reference to support. The second offer, according to [M.T.], was made in March or April 2006 while visiting [C.K.] in Indiana. [M.T.] testified that in a private conversation an offer to pay support in the sum of $200.00 per month was made. The offer was reportedly declined by [C.K.] who explained that they were receiving TANF benefits for [M.S.T.]. [C.K.] denies that any such conversation occurred.

25. There is no evidence that the offers for support were made at the direction, request and/or authorization of the father or the mother.

26. There is no evidence that the father or the mother ever personally offered or tendered any money for the provision of [M.S.T.'s] care and support in the eight and one-half years he has lived with the Petitioners.

27. Petitioners have claimed [M.S.T.] as a dependent for federal and state tax purposes and have been qualified for the earned income tax credits and TANF benefits. However, no entitlement dollars have been received by the Petitioners that are attributable to the earnings and/or any benefit status of the father or mother.

App. pp. 12-13. The trial court concluded in part:

9. Although his mother may have made overtures to provide for the child's care and support, the father, who bears the duty for the child's care, has never made any such communication or offer. The Court concludes that any offer by a third party to contribute to the child's care cannot be in substitution to the father's obligation under the law. The rights of a parent to his or her child are specific to the individual as are the parent's obligations and duties. A parent cannot avoid the consequences of his or her failure to provide for a child's care, as contemplated under I.C. 31-19-9-8, by relying on the gratuitous and nonspecific offers made by a third party that were not originated and / or known by the parent.

10. . . . . Now consent is not dispensed with in all cases where the father failed to pay support; it is only dispensed with when, for a period of at least a year, he "knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree." . . . . In this case the father is gainfully employed, owns real estate, has minimal expenses, and engages in few activities that would bring stressors on his financial circumstances.

11. In addition to the lack of fiscal support for the child, the father is not engaged in any of the child's activities or education. He has had only nominal involvement with the child's education and has not demonstrated any understanding or support for the child's needs as a gifted and talented student. Although he has expressed an interest in the return

5

of the child to his care, he has yet to modify his home to accommodate the child's sleeping arrangements and has proposed a plan that would require another third party to assume the primary and daily responsibilities for the child care.

12. Based on the foregoing the Court finds and concludes that the Petitioners have established by the clear and convincing evidence that the father has knowingly failed to provide for the child's care and support when able to do so as required by law for a period of over one year prior to the filing of the petition for adoption. Accordingly, his consent to the adoption is not required.

Id. at 17-18. Father filed a motion to correct error, which was denied. Father now appeals.

**Analysis**

The Petitioners requested findings of fact and conclusions thereon. Accordingly, we apply the following two-tiered standard of review: we determine whether the evidence supports the findings and whether the findings support the judgment. Devlin v. Peyton, 946 N.E.2d 605, 607 (Ind. Ct. App. 2011). "The trial court's findings of fact and conclusions thereon will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them." Id. "A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made." Id. We neither reweigh the evidence nor assess the credibility of witnesses and consider only the evidence most favorable to the judgment. Id.

At issue here is whether Father's consent to the adoption was required. Pursuant to Indiana Code Section 31-19-9-8,

6

(a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:

* * * * *

(2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A) fails without justifiable cause to communicate significantly with the child when able to do so; or

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree. . . .

Because the trial court specifically concluded that Indiana Code Section 31-19-9-8(a)(2)(A) was not a basis to dispense with Father's consent, our review is limited only to whether, for at least one year, Father knowingly failed to provide for the care and support of M.S.T. when able to do so as required by law or judicial decree. Under these circumstances, the Petitioners had burden of proving Father's consent was unnecessary by clear and convincing evidence. See In re Adoption of M.B., 944 N.E.2d 73, 77 (Ind. Ct. App. 2011); Ind. Code § 31-19-10-1.2(a).

### I. Findings of Fact

Father argues that the trial court's finding number 25 was clearly erroneous. This finding provides, "There is no evidence that the offers for support were made at the direction, request and/or authorization of the father or the mother." App. p. 13. Father argues that M.T. "had both the express and implied authority to offer child support on behalf of her son as she handled his financial affairs, his bank account and payment of his bills, and made all visitation arrangements." Appellant's Br. p. 20.

7

The trial court acknowledged that the evidence of the offers of support by M.T. was disputed by the Petitioners. Even assuming these offers were made, there is no evidence that they were made in M.T.'s capacity as Father's agent.

Regarding an agent's authority we have explained:

> Actual authority is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. The focus of actual authority is the belief of the agent. Actual authority may be express or implied and may be created by acquiescence.

Fidelity Nat. Title Ins. Co. v. Mussman, 930 N.E.2d 1160, 1165 (Ind. Ct. App. 2010) (citations omitted), trans. denied.

Father argues, "Given the fact that father was virtually handicapped and his mother handled his financial and visitation arrangements, the most logical inference is that his mother offered support on his behalf." Appellant's Reply Br. p. 7 (citations omitted). At the hearing, Father explained that he handed his financial affairs over to M.T. after his "finances were messed up by [his] ex-wife" and that there was no particular reason for letting the arrangement continue. Tr. p. 449. He testified, "I could do it myself. . . . I just choose to leave it the way it is. Like I said, it's not broken, so I just don't try to fix it." Id. at 450. Although Father directs us to his testimony that he has "some vision problems" and cannot drive, id. at 365, this evidence does not support Father's assertion that he was "virtually handicapped" so as to prevent him from handling his own financial affairs, and there is no evidence Father has been declared incompetent to handle such.

8

Further, Father does not direct us to any evidence that M.T. made the offers of support based on his words or conduct that reasonably caused her to believe that he desired her to do so—either expressly or impliedly. Because the record does not reveal that M.T. made the offers at Father's direction, request, or authorization, Father has not established that this finding was not supported by the evidence.

Father also argues that the trial court's finding number 26 is not supported by the evidence. That finding provides, "There is no evidence that the father or the mother ever personally offered or tendered any money for the provision of [M.S.T.'s] care and support in the eight and one-half years he has lived with the Petitioners." App. p. 13. Father claims that, in addition to M.T.'s offers of support for which he was present, he asked the petitioners if they needed money and they said no.

The testimony to which Father's refers in support of this argument is vague. Specifically, Father testified, "Well, you know, asked [the Petitioners] if they needed money and they said no."[2] Tr. p. 529. Moreover, Father answered "No." when questioned, "But you never asked . . . if they needed money. Right?" Id. at 529-30. Father also answered "No." when asked, "have you ever offered any financial assistance to [the Petitioners]?" Id. at 470. Accordingly, Father has not established that this finding is not supported by the evidence.

## II. Conclusion that Father Knowingly Failed to Provide Support

---

[2] No words are missing from this quote. Father did not testify who asked the Petitioners if they needed money.

9

Father argues that the trial court erroneously concluded that his consent to the adoption was not required because he knowingly failed to provide for M.S.T.'s care and support.[3] To the extent Father points out there was no court-ordered child support obligation, Indiana law imposes a duty upon a parents to support their children. In re M.A.S., 815 N.E.2d 216, 220 (Ind. Ct. App. 2004). "This duty exists apart from any court order or statute." Id. It is well-settled that parents have a common law duty to support their children, and the lack of a court order did not relieve Father of that obligation. See M.B., 944 N.E.2d at 77. Father even recognized this obligation when he testified that, as M.S.T.'s father, he has always had a duty to "financially take care of" M.S.T. Tr. p. 529. The lack of a court-ordered child support obligation is not a basis for reversal.

Father also asserts that the trial court's conclusion is incorrect because he did not knowingly "refuse" to pay support. Appellant's Br. p. 20. The statute, however, requires only that a parent "knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree." I.C. § 31-19-9-8-(a)(2)(B) (emphasis added). In the absence of authority supporting this assertion, Father has not established that the evidence must show that he knowingly "refused" pay for M.S.T.'s care and support.

In support of his argument that he did not knowingly fail to provide for the care and support of M.S.T., Father contends that the childcare authorization letters drafted by

---

[3] Father does not argue on appeal that he was unable to support M.S.T or that he did provide for the care and support of M.S.T. after 2002.

10

the Petitioners did not require Father to pay support, that the Petitioners never requested support from him, that the Petitioners did not want support, that the Petitioners did not need support, and that the Petitioners received TANF benefits instead of seeking child support from him and could not have received both. Father also suggests that the Petitioners did not want to return M.S.T. to him and did not want to "rock the boat" by asking for support. On all of these points, Father is asking us to reweigh the evidence, which we cannot do. Appellant's Br. p. 17.

Father also argues that his regular visitation and communication with M.S.T. and his good income are evidence that he did not intend to relinquish his parental rights. Although the trial court concluded that Father did not abandon M.S.T. and did not fail to communicate with him for a year, the trial court described Father's contact with M.S.T. as "infrequent and often with limited interaction[.]" App. p. 16. Father's argument on this point is another request to reweigh the evidence, which we must decline.

The trial court found that Father acknowledged his duty of support, that he had not provided for M.S.T.'s care and support since M.S.T. was placed with the Petitioners, that M.T.'s two[4] offers of support were disputed by C.K., that there was no evidence Father

---

[4] In its findings, the trial court acknowledged M.T.'s testimony regarding her two offers of support. Father points out that his grandmother, who is M.T.'s and C.K.'s mother, provided video-taped testimony regarding a third offer and that this testimony was not mentioned in the trial court's findings and conclusions. Father argues that it "makes one wonder if the trial court even watched the video of C.K.'s own mother." Appellant's Reply Br. p. 10. Although Father's grandmother's testimony is inconsistent with M.T.'s own testimony describing the only two offers she made, Father contends that, because his grandmother was M.T.'s and C.K.'s mother, her testimony "should have been given substantial weight." Id. Without more, Father has not established that the trial court overlooked his grandmother's testimony and, to the extent it is inconsistent with M.T.'s testimony, we may not reweigh the evidence. Regardless, Father's grandmother's testimony that M.T. made a third offer of support to C.K. does not change the outcome.

11

directed, requested, or authorized M.T. to make the purported offers of support, and that Father never personally offered or tendered any money for M.S.T.'s care and support. These findings support that trial court's conclusion that Father knowingly failed to provide for the care and support of M.S.T. as required by Indiana Code Section 31-19-9-8(a)(2)(B).

### III. Estoppel

Father argues that the Petitioners should be estopped from claiming that his consent was not required because they refused the offers of support, inducing him to stop making offers.[5] Estoppel is "a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct." Brown v. Branch, 758 N.E.2d 48, 52 (Ind. 2001).

Presuming the doctrine of estoppel applies in this context, Father's claim is unavailing. First, the evidence of any offers of support was disputed by the Petitioners. Both C.K. and J.P. testified that neither M.T. nor Father offered any financial assistance and that, accordingly, they never refused an offer of support. Further, the trial court found that there was no evidence that the purported offers were made at the direction, request, or authorization of Father. The trial court concluded that, although M.T. may have made "overtures" to provide support, those offers were "gratuitous and nonspecific." App. p. 17.

---

[5] Father specifically frames this argument as one of estoppel and not waiver. See Appellant's Reply Br. p. 4.

12

Even assuming M.T. made the two offers of support during the eight years M.S.T. was in the Petitioners' custody and the Petitioners rejected those offers, we cannot conclude that the Petitioners' rejection of M.T.'s occasional offers induced <u>Father</u> to act in a particular manner. Because Father never instigated the offers of support, he cannot now claim that he was entitled to and did rely on the Petitioners rejection of M.T.'s offers. Likewise, we are not convinced that Father was entitled to and did rely on the Petitioners' failure to seek child support and decision to pursue TANF benefits so as to bar them claiming that Father's consent to the adoption was not required.

Accordingly, this case is distinguishable from <u>In re Adoption of Bryant</u>, 134 Ind. App. 480, 189 N.E.2d 593 (1963), in which there was uncontradicted evidence that the father made an offer of support, which was rejected by the mother. In analyzing a prior version of the consent statute, we observed that the lack of support payments did not constitute a failure within the meaning of the statute. <u>Bryant</u>, 134 Ind. App. at 492, 189 N.E.2d at 599. We concluded, "To hold otherwise would put the parental rights of every father that has been deprived of custody of his children at the mercy of the children's custodian to extinguish such rights almost at will, by simply refusing his support." <u>Id.</u>, 189 N.E.2d at 599. Here, because the disputed evidence shows that M.T. made the offers of support, not Father, <u>Bryant</u> does not support Father's estoppel argument. Father has not established that the Petitioners should be estoped from asserting that his consent to the adoption is not required.

13

**Conclusion**

The evidence supports the findings and the findings support the trial court's conclusion that Father's consent to the adoption was not required because he knowingly failed to provide for the care and support of M.S.T., and the Petitioners are not estopped from asserting that Father's consent to the adoption is not required. We affirm.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.