## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 10 2020, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryce H. Bennett
Justin O. Sorrell
Drake T. Land
Riley Bennett Egloff LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Andrew A. Crosmer
Daniel J. Zlatic
Rubino, Ruman, Crosmer &
Polen, LLC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Penske Truck Leasing Co., L.P.,

*Appellant-Defendant,*

v.

Debra Dalton-McGrath and
John McGrath,

*Appellees-Plaintiffs.*

September 10, 2020

Court of Appeals Case No.
20A-CT-94

Interlocutory Appeal from the
Lake Superior Court

The Honorable Kristina C. Kantar,
Judge

Trial Court Cause No.
45D04-1801-CT-18

**Bradford, Chief Judge.**

# Case Summary

[1] On November 4, 2017, Debra McGrath was bitten by a dog when she visited Julie's Auto Sales ("JAS") for the purpose of renting a moving truck. The truck in question was owned by Penske Truck Leasing Co., L.P ("Penske"), and rented through JAS. Debra and her husband John (collectively, "the McGraths") subsequently filed suit against Julie Dirindin, JAS, and Penske, alleging negligence. With respect to Penske, the McGraths argued both direct and vicarious liability. Penske moved for summary judgment. This interlocutory appeal follows the denial of Penske's motion. Penske contends that the trial court erred in denying its motion for summary judgment, arguing that no issues of material fact remain that would preclude summary judgment on either the direct- or vicarious-liability claims. We affirm in part, reverse in part, and remand for further proceedings.

# Facts and Procedural History

[2] At all times relevant to this interlocutory appeal, Dirindin owned and operated JAS. JAS offered vehicle rentals, including moving trucks owned by Penske. In answers to interrogatories designated in support of Penske's motion for summary judgment, Dirindin described the events surrounding the dog bite as follows:

I left my home before 8:00 a.m. with Cam[1] and went to the office. I took care of small tasks, while I waited for Debra McGrath to arrive for her 9:00 a.m. reservation. Debra McGrath called a little after 9:00 a.m. to say that she was delayed. I advised her that I would be closing the office at 10:00 a.m. Shortly after 10:00 a.m., I locked the door, put up the closed sign, took Cam for a walk and loaded up my car. I brought Cam back into the office and locked and closed the door behind me. At approximately 10:20 a.m. Debra McGrath pulled the door open, which was locked but apparently it was not fully shut. It startled me and as Debra McGrath held the door open and stood in the doorway Cam ran and bit her in her leg.

Appellant's App. Vol. II p. 67.

[3] In early 2018, the McGraths filed suit against Dirindin and JAS. On November 7, 2018, the McGraths filed an amended complaint in which they argued that Penske was directly negligent and vicariously liable for Dirindin's negligence. Penske moved for summary judgment. The trial court denied Penske's motion for summary judgment on November 25, 2019.

# Discussion and Decision

[4] Penske contends that the trial court erroneously denied its motion for summary judgment.

> When reviewing a grant or denial of a motion for summary judgment our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. The party moving for summary judgment has the

---

[1] On November 4, 2017, Dirindin was caring for Cam, a pit-bull mix owned by her daughter who was attending college at St. Mary's College in South Bend.

burden of making a prima facie showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Once these two requirements are met by the moving party, the burden then shifts to the non-moving party to show the existence of a genuine issue by setting forth specifically designated facts. Any doubt as to any facts or inferences to be drawn therefrom must be resolved in favor of the non-moving party. Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows there is no genuine issue of material fact and that the moving party deserves judgment as a matter of law.

*Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016) (internal citations omitted).

# I. Direct Liability

Penske contends that the trial court erred in denying its motion for summary judgment on the McGraths' direct-liability claim. In claiming that Penske was directly liable for Debra's injuries, the McGraths alleged that Penske "was negligent in permitting its agent to keep an unleashed or unrestrained dog on the business premises where Penske customers were exposed to this unnecessary risk of harm." Appellant's App. Vol. II p. 42. The McGraths further allege that they "were injured and suffered damages" as a result of Penske's negligence. Appellant's App. Vol. II p. 42.

"To prevail on a claim of negligence the plaintiff must show: (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty." *Goodwin*, 62 N.E.3d at 386 (internal quotation and

brackets omitted). "Absent a duty there can be no negligence or liability based upon the breach." *Id.* "Whether a duty exists is a question of law for the court to decide." *ONB Ins. Grp., Inc. v. Estate of Megel*, 107 N.E.3d 484, 489 (Ind. Ct. App. 2018), *trans. denied.* We therefore review *de novo* whether Penske owed a duty to the McGraths. *See id.* Further, "[n]egligence will not be inferred; rather, all of the elements of a negligence action must be supported by specific facts designated to the trial court or reasonable inferences that might be drawn from those facts." *Kincade v. MAC Corp.*, 773 N.E.2d 909, 911 (Ind. Ct. App. 2002). "An inference is not reasonable when it rests on no more than speculation or conjecture." *Id.*

## A. Premises Liability

[7] It is undisputed that Penske could not be directly liable to the McGraths as the dog's keeper or owner. The designated evidence clearly establishes that Dirindin was the dog's keeper and her daughter was the dog's owner. The McGraths instead rely on the theory of premises liability, asserting that a question of material fact remains as to whether Penske had sufficient control over the JAS premises to create a duty for Penske to act to prevent foreseeable harm. In order to prevail on their claim against Penske, the McGraths were required to prove that Penske "retained control over the property" and "had actual knowledge of" the dog's dangerous propensities. *See Baker v. Weather ex rel. Weather*, 714 N.E.2d 740, 741 (Ind. Ct. App. 1999) (providing that in order for plaintiffs to prevail against landlords under a theory of premises liability on a claim of negligence relating to a dog bite by a dog neither owned or cared for

by the landlords, the plaintiffs were required to show that the landlords retained control over the property and had actual knowledge that the dog had dangerous propensities).

[8] "When a case involves a non-owner, liability turns upon the degree of control such person or entity exercises over the premises." *Johnson v. Steffen*, 685 N.E.2d 1117, 1119 (Ind. Ct. App. 1997). "The reasons the law imposes liability on the person who controls the property is self-evident: only the party who controls the land can remedy the hazardous conditions which exist upon it and only the party who controls the land has the right to prevent others from coming onto it." *City of Bloomington v. Kuruzovich*, 517 N.E.2d 408, 411 (Ind. Ct. App. 1987). "Thus, the party in control of the land has the exclusive ability to prevent injury from occurring." *Id.* The dispositive question is therefore whether Penske exercised sufficient control over the JAS premises so as to be deemed the possessor. *See Crist v. K-Mart Corp.*, 653 N.E.2d 140, 145 (Ind. Ct. App. 1995). If Penske had control over the premises, then it owed a duty to its invitees to exercise reasonable care for their protection while on the premises. *See id.* However, if Penske had no control over the premises, it owed no duty to the McGraths. *See id.*; *see also Cox v. Stoughton Trailers, Inc.*, 837 N.E.2d 1075, 1082 (Ind. Ct. App. 2005) ("[P]remises liability cases generally have required an owner of property to have some degree of actual control over the property—not merely constructive ability to control—in order for a duty to prevent injury to attach to the owner.").

The designated evidence shows that JAS and Penske entered into an agreement ("the Agency Agreement") on December 12, 2012, which granted JAS the non-exclusive right to rent Penske-owned trucks to the public. With regard to JAS's premises, the Agency Agreement provided, in relevant part, as follows:

> III. Agent Premises
>
> A.      Hours of Operation. Agent agrees to conduct its rental business, as contemplated by this Agreement, for a minimum of six days a week during normal business hours plus additional hours (1) as required by business demands; (2) in accordance with the provisions of the Agreement or the Rental Agreement; and/or (3) as otherwise required by Penske.
>
> B.      Appearance and Upkeep. Agent shall, at its own cost and expense, maintain the Premises in a clean and presentable manner and in such a way as to contribute to the goodwill of the Penske name. Agent will make all improvements or modifications as reasonably required by Penske to maintain a suitable appearance at the Premises.
>
> C.      Penske Access to Premises and Equipment; Re-distribution of Equipment. Agent shall make its Premises available for Penske representatives, with or without notice, to audit, inspect, or repair Equipment, signs and supplies and other Penske-owned or supplied property or any records related thereto. In addition, Agent agrees that Penske may come onto the Premises at any time to remove Equipment. Agent shall strictly comply with all of Penske's instructions regarding re-distribution of Equipment as described in Section II, Paragraph D.
>
> D.      Safeguarding of Equipment. Agent shall ensure that all Equipment is legally parked. Agent shall protect all Penske Equipment, supplies, and property at the Premises. Agent shall

not be responsible for any lost or stolen Equipment, Penske-provided supplies or property, or any vandalism thereto if Agent took all reasonable measures to secure and protect the Equipment and Penske-provided supplies and property. Penske reserves the right to cancel this Agreement in the event of any persistent problems with vandalism or damage to Equipment, regardless of fault and regardless of preventative measures taken by Agent.

Appellant's App. Vol. II p. 63. Thus, pursuant to the terms of the Agency Agreement, JAS was required to allow Penske access to the premises, with or without notice, "to audit, inspect, or repair Equipment, signs and supplies and other Penske-owned or supplied property or any records related thereto" and "at any time to remove" Penske-owned equipment. Appellant's App. Vol. II p. 88. In addition, the Agency Agreement required JAS to maintain the premises in "a clean and presentable manner" and to take "all reasonable measures to secure and protect the Equipment and Penske-provided supplies and property." Appellant's App. Vol. II p. 88.

[10] Dirindin testified that a Penske representative visited JAS "approximately two, three times a year" to review "what business has been done and what the numbers are." Appellant's App. Vol. II p. 49. During one of these visits, which would last approximately twenty minutes, the Penske representative would "compare your business from last year to this year" and "update you on any … new things that they are doing[.]" Appellant's App. Vol. II p. 51. In addition, Mary Ann Angelo, a litigation claims examiner for Penske, averred that

9. Penske issued no command or instruction to Dirindin, actual or implied, regarding keeping animals at [JAS].

10. Penske had never seen an unrestrained dog at [JAS] at any time.

11. Penske had no knowledge that Dirindin kept her daughter's dog on the premises at [JAS] on or before November 4, 2017.

12. Penske had no knowledge of the existence, breed propensities, history, or methods of confinement of the dog that was at [JAS] on November 4, 2017.

Appellant's App. Vol. II p. 85.

[11] Penske argues that the designated evidence shows that there is no issue of material fact as to whether Penske had control over JAS's premises. Penske acknowledges that while it had a right to enter the premises for the purposes set forth above, its right was limited to Penske-owned and supplied property and did not grant it control over the JAS premises in general or over any other part of JAS's business. Further, while Penske did not have a policy relating to having animals on the premises, nothing in the designated evidence indicates or even suggests that Penske had the authority or ability to prevent Dirindin from keeping dogs and other animals on the premises.

[12] The McGraths argue that Penske's limited right to enter the premises and exert control over Penske-owned and supplied property creates a question of fact as to whether Penske exerted the necessary level of control to create a duty. We cannot agree. While the designated evidence establishes that Penske had a

limited right to enter the premises and control over Penske-owned and supplied property, nothing in the designated evidence indicates that Penske had control over the premises itself or any non-Penske-owned or supplied property.

## B. *Goodwin* Test for Determining Duty

Penske further argues that there is no material issue of fact relating to whether it otherwise owed a duty to the McGraths under Indiana law. In *Goodwin*, the Indiana Supreme Court established a three-part balancing test for determining whether a duty exists when one has not otherwise been established by law. 62 N.E.3d at 387; *see also ONB*, 107 N.E.3d at 489. Under this test, we consider: (1) the relationship between the parties, (2) the reasonable foreseeability of harm, and (3) public policy concerns. *Goodwin*, 62 N.E.3d at 387; *see also ONB*, 107 N.E.3d at 489.

### 1. Relationship Between Parties

Generally, a duty of reasonable care is not owed to the world at large, but instead arises out of a relationship between the parties. *See Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind. Ct. App. 2004), *trans. denied*. In this case, to the extent that a relationship existed between Penske and the McGraths, the relationship was indirect and limited. The undisputed designated evidence demonstrates that Debra contacted JAS to rent a moving truck. Debra visited JAS on November 4, 2017, for the purpose of renting the truck. The Agency Agreement clearly stated that neither Dirindin nor any other JAS employee could be construed as employees of Penske. The McGraths were not parties to

the Agency Agreement which created "the limited, non-exclusive agency relationship between" JAS and Penske. Appellant's App. Vol. II p. 87. Further, there is no designated evidence indicating that either of the McGraths ever interacted with a Penske employee. While Debra unquestionably had a relationship with JAS, the designated evidence does not indicate that she had any relationship with Penske.

## *2. Foreseeability*

[15]     The Indiana Supreme Court has recognized that in some negligence cases, foreseeability is not just a question of proximate cause, but also a question of duty. *See Goodwin*, 62 N.E.3d at 389; *Rogers v. Martin*, 63 N.E.3d 316, 325 (Ind. 2016).

> But foreseeability in this context—as a component of duty—is evaluated differently than foreseeability in proximate cause determinations: while the latter foreseeability analysis requires a factfinder to evaluate the specific facts from the case, the former involves a lesser inquiry, requiring a court, as a threshold legal matter, to evaluate the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence. By focusing on the general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected, courts must assess whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it, not merely that harm is sufficiently likely[.] Because almost any outcome is possible and can be foreseen, this ensures that landowners do not become the insurers of their invitees' safety[.]

*Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837, 840 (Ind. 2020) (brackets added; other brackets, quotations, and citations omitted). "[T]he mere fact that a particular outcome is 'sufficiently likely' is not enough to give rise to a duty." *Goodwin*, 62 N.E.3d at 392. "Instead, for purposes of determining whether an act is foreseeable in the context of duty we assess whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." *Id.*

[16]  At common law all dogs, regardless of breed or size, are presumed to be harmless, domestic animals. Absent a statute to the contrary the common law presumption must prevail. To overcome the presumption that a domestic, as opposed to a wild, animal is harmless, one must point to a known vicious or dangerous propensity of the animal in question. A dangerous or vicious propensity has been defined in Indiana as a propensity or tendency of an animal to do any act which might endanger the safety of person or property in a given situation. It is the act of the animal and not in the state of mind of the animal from which the effects of a dangerous propensity must be determined. It is not, therefore, reasonable to attribute vicious propensities to a dog merely because he barks at strangers, because a person is afraid of the dog, or because a city ordinance requires a dog to be restrained at all times.

*Royer v. Pryor*, 427 N.E.2d 1112, 1117 (Ind. Ct. App. 1981) (internal citations and quotation omitted). Likewise, it is not reasonable to attribute vicious propensities to a dog merely because of a "Beware of Dog" sign. *See generally Smedley v. Ellinwood*, 21 A.D.3d 676, 677, 799 N.Y.S.2d 682, 683 (N.Y. App. Div. 2005) ("[T]he presence of a 'Beware of Dog' sign, standing alone, is insufficient to impute notice of a dog's viciousness."); *Wright v. Morris*, 239

S.E.2d 225, 226 (Ga. Ct. App. 1977) (providing that presence of a sign stating "Beware of Dog" on a fence surrounding appellee's home is not, alone, sufficient to raise a jury question regarding liability as it "does not in and of itself establish or tend to establish knowledge of the propensities of the resident animal").

[17] The designated evidence indicates that Dirindin put up the "Beware of Dog" sign in 2012, before her daughter had rescued Cam. Dirindin described Cam as a "home dog" that Dirindin occasionally took places but otherwise "stay[ed] at home." Appellant's App. Vol. II p. 54. Prior to November 4, 2017, Cam had been to JAS "on occasion … some months zero, other months, you know, once or twice." Appellant's App. Vol. II p. 55. The designated evidence further indicated that no Penske representative had ever observed an unrestrained dog at JAS and Penske had "no knowledge of the existence, breed propensities, history, or methods of confinement of the dog that was at [JAS] on November 4, 2017." Appellant's App. Vol. II p. 85. Nothing in the designated evidence suggests that Penske had any knowledge that Dirindin had a dog on JAS's premises on November 4, 2017, let alone a dog with dangerous propensities.

[18] Furthermore, to the extent that the trial court pointed to a prior police complaint regarding a dog bite on JAS's premises,[2] the Indiana Supreme Court

---

[2] While the record is unclear about the dog involved in this alleged prior complaint, it does not appear to have involved Cam as the designated evidence indicates that Cam had never demonstrated aggressive propensities or vicious tendencies prior to November 4, 2017.

recently made it clear that this type of historical evidence is inappropriate to consider when evaluating foreseeability as a component of duty. *See Cavanaugh's Sports Bar*, 140 N.E.3d at 844 ("[H]istorical evidence, while 'appropriate in evaluating foreseeability in the context of proximate cause,' should play no role when we evaluate 'foreseeability as a component of duty.' *Goodwin*, 62 N.E.3d at 393."). Given that the presence of the "Beware of Dog" sign was, without more, insufficient to impute notice to Penske of Cam's allegedly aggressive propensities or viciousness, we conclude that Debra's injury was not foreseeable to Penske as there was nothing in the record that would have alerted Penske that there was some probability or likelihood of harm that was serious enough to induce a reasonable person to take precautions to avoid it. *See Goodwin*, 62 N.E.3d at 392. Stated differently, this broad type of defendant, *i.e.*, a rental equipment owner whose equipment is rented through independently owned and operated businesses, would have no reason to foresee that its conduct, *i.e.*, providing equipment for the independently owned and operated business to rent to its customers, would result in the broad type of harm, *i.e.*, a dog bite, to this broad type of plaintiff.

### 3. Public Policy

[19]    "The final factor in the *Goodwin* test is the public policy consideration of who is, or should be, in the best position to prevent injury and how society should allocate the costs of such injury." *ONB*, 107 N.E.3d at 494 (internal quotation omitted). In this case, the entities best suited to prevent Debra's injury were Dirindin and JAS. As Penske had no control over the dog in question or

knowledge that it was on the JAS premises on November 4, 2017, this factor weighs against finding Penske had a duty to the McGraths. *See id.* (providing that this factor weighs against finding ONI had a duty to the accident parties because ONI had no control over the actual means by which the accident occurred and the entities best suited to prevent injury to a motorist were the individual who drove the truck that caused the accident and the owner of the truck).

We conclude that all three of the *Goodwin* factors weigh in favor of the conclusion that, as a matter of law, Penske did not owe a duty to the McGraths. Again, "[a]bsent a duty there can be no negligence or liability based upon the breach." *Goodwin*, 62 N.E.3d at 386. As such, we conclude the trial court erred when it denied Penske's motion for summary judgment on the McGrath's direct-negligence claim.

## II.  Vicarious Liability

Penske also contends that the trial court erred by denying its motion for summary judgment on the McGraths' vicarious-liability claim. "Vicarious liability is indirect legal responsibility." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999) (internal quotation omitted). "It is a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer." *Id.* "Courts employ various legal doctrines to hold people vicariously liable, including respondeat superior, apparent or

ostensible agency, agency by estoppel, and the non-delegable duty doctrine." *Columbus Reg'l Hosp. v. Amburgey*, 976 N.E.2d 709, 714 (Ind. Ct. App. 2012).

[22] "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 518–19 (Ind. 2014).

> A principal is liable for the acts of his agent that were committed within the scope of the agent's actual or apparent authority. Apparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's manifestations to a third party and not from the representations or acts of the agent. The manifestations can originate from direct or indirect communication, or from advertisements to the community.

*Helms v. Rudicel*, 986 N.E.2d 302, 309 (Ind. Ct. App. 2013). "Actual authority is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Fid. Nat. Title Ins. Co. v. Mussman*, 930 N.E.2d 1160, 1165 (Ind. Ct. App. 2010). "The focus of actual authority is the belief of the agent." *Id.* "Actual authority may be express or implied and may be created by acquiescence." *Id.*

[23] It is undisputed that JAS and Penske shared an agent-principal relationship on November 4, 2017. In arguing that the trial court erred by denying its motion

for summary judgment, Penske asserts that it was entitled to judgment as a matter of law because no issue of material fact remained as to whether Dirindin's negligence was committed within the scope of this relationship. We disagree.

[24] The Agency Agreement created "a limited, non-exclusive agency relationship between" Penske and JAS. Appellant's App. Vol. II p. 62. While the terms of the Agency Agreement did not expressly permit JAS to possess a dog on the premises for or on behalf of Penske, it did require JAS to protect all Penske-owned and supplied property and indicated that JAS would not be liable for any damaged or stolen equipment if JAS "took all reasonable measures to secure and protect" the Penske-owned and supplied property. Appellant's App. Vol. II p. 63. The designated evidence indicates that Dirindin posted the "Beware of Dog" sign "in an effort, in part, to protect Penske equipment" and "would occasionally bring a dog (including Cam) to her office for safety and protection." Appellant's App. Vol. II p. 118. Thus, one could reasonably argue that Dirindin was acting within the scope of her authority as Penske's agent by having a dog on the premises as a means of protecting Penske's equipment and property.

[25] Furthermore, the designated evidence indicates that Penske listed JAS as an authorized rental location and indicated that JAS's normal hours of operation included the hours of 8:00 a.m. to 3:00 p.m. on Saturdays. It also indicates that McGrath successfully arranged to rent a Penske truck from JAS and arrived at JAS to pick up the truck within the publicized hours of operation. This

evidence creates an issue of material fact as to whether Dirindin's negligence fell within either JAS's actual or apparent authority to act as Penske's agent. As such, we conclude that the trial court properly denied Penske's motion for summary judgment relating to the McGraths' vicarious-liability claim.

[26] The judgment of the trial court is affirmed in part and reversed in part and the matter remanded to the trial court for further proceedings.

Najam, J., and Mathias, J., concur.